UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                  Plaintiff,<br><br>v.<br><br>DAVID ELIAS MARTINS,<br><br>                                  Defendant. | Case No.: 19-cr-4615-AJB-1<br><br>**ORDER DENYING MOTION FOR COMPASSIONATE RELEASE**<br><br>**(ECF No. 199)** |

On April 21, 2025, Defendant Martins ("Martins") filed a Motion for Compassionate Release ("Motion"). (ECF No. 199.) He fully exhausted his claim by presenting it to the Warden at FCI Terminal Island, which was rejected. His claim was that FCI Terminal Island was unwilling to provide Martins the specialized care that he requires for his medical needs, to wit: timely response to urinary tract infections ("UTI") and possession and full access of the InterStim device to address emptying his bladder.

Martins has a neurogenic bladder that limits his ability to empty his bladder and makes him prone to UTI's. He addressed the issue by self-catheterization but has been provided an InterStim device by the Bureau of Prisons. The device stimulates his bladder allowing for urination. The Interstim has two components, a surgical implant, and an external control device for operation and adjustment.

     Martins submits that his unique medical situation presents "extraordinary and compelling reasons" for granting a motion for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i). Essentially, Martins alleges that he is not allowed to keep the electronic control device himself to make real-time adjustments and empty his bladder. The device was withheld from personal possession due to security issues associated with an inmate having a device like a cell phone in his possession. Martins has repeatedly asked to keep the device so that he could use it to drain his bladder immediately when needed, to avoid developing a UTI. Martins has been told that this is not possible due to security concerns.

     At FCI Terminal Island, Martins was able to access the electronic device during the morning pill call and night pill call (Monday–Friday). Other than those scheduled times, Martins was only able to access the device if a staff member is available to bring it to him and agrees to do so. (ECF No. 202 Ex. A, at 40.) He complains, however, that this was inadequate and his calls for access at times were unheeded.

     The Court appointed the same counsel for Martins for this Motion as who handled the underlying case (*see* ECF No. 194), and briefing followed. Hearings on the Motion were held on June 9, 2025, and again on October 2, 2025. (*See* ECF Nos. 209; 225.) At the June hearing, the Court requested further information from the parties including a declaration from Martins about his current issues with the InterStim devices availability, a defense expert report regarding the InterStim Bladder Stimulator, and the Government's further response to Martins' supplements. Between the hearings, Martins was transferred from FCI Terminal Island to FCI Butner[1] ("Butner") in August 2025 and entered the hospital on August 15 for a UTI. (ECF No. 208, Ex. 5.) He was discharged on August 21, 2025. (*Id.*) He was evaluated in the Butner Clinic on August 22, 2025, and scheduled for twice a day use of the InterStim at 8:30 a.m. and 5:30 p.m. (ECF No. 234, Ex. 24.)

     At the October 2 hearing, the Court directed the United States to supplement the

---

[1] Butner Low Security Correctional Institution ("LSCI"), a Federal Bureau of Prisons ("BOP") facility within the Federal Correctional Complex ("FCC") in Butner, North Carolina.

record with the medical records of treatment at Butner including medical visits, hospital admissions, requests for sick call and any grievances submitted by Martins to FCI Butner concerning access to or failure to provide his InterStim Implant Control. This was requested by the Court in response to Martins claim he had been hospitalized 3 times while at Butner for bladder issues.

The claims of the quality of care and access to the controller device at Terminal Island are rendered moot by the transfer, and the focus is now whether extraordinary and compelling reasons exist to justify release from custody currently. There are also no claims that the InterStim Device was not medically indicated nor implemented without informed consent of Martins. The issues are firmly focused on Martins access to the InterStim control device.

The matter was submitted pending receipt of the supplemental records. The supplemental records have been filed as ECF No. 226 and 235 and include approximately 160 pages for Martins' time at FCI Butner. Martins requested an opportunity to respond to the supplemental materials, and was granted until October 27, 2025, to submit any medical records from Butner not submitted as part of the record to date. Further briefing or response was not allowed. Additional records were received as Martins' Exhibit D, which show "call outs" for medical on October 15, 17 and 20 all at 8:30 a.m. (*See* ECF No. 233.) No additional record of hospitalization, infection or specific complaints or findings are included. The lone hospitalization at Butner was upon transfer in August of 2025. (*See* ECF No. 208, Ex. 5.)

## Sentencing

Martins was convicted of distribution of fentanyl following a bench trial on stipulated facts. A subsequent evidentiary hearing led to a finding that the pills distributed by Martins (and his co-defendant girlfriend) caused the death of N.A.R. (ECF No. 92.) Martins was sentenced to 72 months in custody after a substantial variance from the Advisory Sentencing Guidelines. Martins' guidelines were calculated at an Offense Level 35 and a Criminal History Category I yielding a recommended sentence of 168 to 210

months. The Court varied down based on Martins military and employment record, his mental and emotional condition, his physical limitation from a prior gunshot wound including a neurogenic bladder (including a long history of UTI's), his addiction issues and his rehabilitation gaining sobriety.

The Court also considered the need to avoid unwarranted sentencing disparities, with the co-defendant receiving an 84-month sentence. The death of the victim was also considered as an aggravating factor.

## **Martins' History of Bladder Injury**

On May 5, 2007, Martins was struck by a stray bullet while outside of a bar in Georgia. (ECF No. 109 ¶ 95.) The shooting also impacted Martins' urethra resulting in frequent UTIs. (*Id.* at ¶ 96.) Martins told U.S. Probation he had been hospitalized 12 to 14 times because of these issues. (*Id.*) On January 4, 2023, Martins' doctor from the Department of Veteran Affairs ("VA") wrote a letter stating that he has been admitted to the VA Hospital 10 times for urological issues in addition to hospitalizations in non-VA hospitals since 2020. (ECF No. 208, Ex. 1.) The onset of UTI's from self-catheterization was a precipitating factor.

As noted, these issues were presented to the Court during Martins' sentencing hearing. Martins' sentencing memorandum noted how his condition requires him to use a catheter to urinate and he suffers "frequent infections" that often require hospitalization and are a risk to his health. (ECF No. 119, Def. Sent. Memo. at 6:7–7:11.) Martins' memorandum discussed how his doctors were attempting different options to address the ongoing issue, including the installation of a stent in August 2022 and a planned surgery to remove the blockage (called a pyeloplasty). (*Id.*) The pyeloplasty surgery was scheduled for April 10, 2023, and is the reason that Martins' self-surrender date was extended to May 8, 2023. (ECF No. 163-1, Decl. of Counsel Gary Burcham, ¶¶ 7–9.)

On October 17, 2024, the InterStim device was permanently installed in Martins. (ECF No. 208, Ex. 12.) It appears to Martins began having issues with the device in February of 2025. (*See* ECF No. 215, Declaration of Defendant, ("Martins Decl."), at ¶ 15;

*see also* ECF No. 208, Exs. 18–19.) These issues resulted in him returning to self-catheterization, the exact same process he was using to deal with his urinary issues prior to the installation of the InterStim device. (Martins Decl. ¶ 15.) While there are no notations regarding the InterStim device having the same positive results it did in the beginning, on March 4, 2025, March 10, 2025, and April 21, 2025, Martins was evaluated by medical staff at FCI Terminal Island and found not to be in any pain or acute distress. (ECF No. 204, Exs. 18–20; ECF No. 208, Exs. 18–20.)

### Martin's Current Custody Setting

According to Jessica Runyon, the Assistant Health Services Administrator at Butner, Martins is provided scheduled access to the Control Device two times each day, once at 8:30 a.m. and once at 5:30 p.m. (ECF No. 219-1, Declaration of Jessica Runyon ("Runyon Decl."), at ¶ 8.) When Martins is not using the Control Device, it is stored in the Pharmacy within the Health Services Department at Butner. (*Id.* ¶ 9.) In a supplemental declaration filed on October 10, ECF No. 226, Ms. Runyon added that—

> At LSCI Butner, thirty minutes after every hour between 5:30 a.m. and 9:30 p.m. (for example, 6:30 a.m., 7:30 a.m., 8:30 a.m., etc.) is open movement which means inmates may move throughout the facility from one location to another without being escorted by staff. This includes moving to educational programs, the Health Services Department, or recreational programs. During these hours, any inmate, including Mr. Martins, may go to the Health Services Department on their own accord without a staff escort if they wish.
>
> The above-referenced open movement schedule is also the reason Mr. Martins' two scheduled times for access to the Control Device are both thirty minutes after the hour (i.e., 8:30 a.m. and 5:30 p.m.). This allows Mr. Martins to move on his own accord to these appointments without the need for a staff escort.

(ECF No. 226, Supplemental Declaration of Jessica Runyon, ("Runyon Suppl. Decl."), at ¶¶ 3–4.)

Ms. Runyon continues—

> The Health Services Department at LSCI Butner is staffed 16 hours each day from 5:30 a.m. to 9:30 p.m. During the times the Health Services Department is staffed, [Mr.] Martins can request access to the Control Device by

> contacting an officer within his housing unit. The officer will then contact the Health Services Department via radio and the staff in that department will advise the officer if [Mr.] Martins should be brought over to the department. It is a routine occurrence at LSCI Butner for inmates to contact the Health Services Department in this manner.

(Runyon Decl. ¶ 11.) Ms. Runyon also states—

> During the times the Health Services Department is not staffed (i.e., from 9:30 p.m. to 5:30 a.m.), [Mr.] Martins can still request access to the Control Device by contacting an officer in his housing unit. During these times, the officer would then contact the Lieutenant on shift, and they would reach out to staff at FMC Butner, which has medical staff on duty twenty-four hours a day. The medical staff at FMC Butner would then determine how to proceed. This process is intended to be used for emergency situations.

(*Id.* ¶ 12.)

Ms. Runyon further states that the procedures for handling inmate complaints at Butner include, in part, notifying her so that she is aware of any issues raised by an inmate regarding the medical care they are receiving. (*Id.* ¶ 13.) As of August 27, 2025, she had not been made aware of any complaints made by Martins regarding the care he has been receiving since he has been Butner, including complaints regarding his ability to access the Control Device. (*Id.*)

Defense Expert Dr. Matthew E. Karlovsky states, "It is an essential requirement to possess the controller for proper bladder function and emptying." and that "there is no medically reasonable justification to withhold it from DM." (ECF No. 223 at 10, Report of Matthew E. Karlovsky, M.D., F.A.C.S., ("Karlovsky Report").) This is based, in part, on Martins' complaints as outlined in his Declaration, which was filed before his transfer to FCI Butner. (*See* Karlovsky Report at 2 (listing documents reviewed); *see also* Martins Decl.) Presumably, Dr. Karlovsky would still favor giving Martins total control of the device, even though Butner's access policy to the device is not as limited as the doctor seems to assume. Of course, Dr. Karlovsky has no expertise in prison in prison security management, which is a significant issue as well.

Dr. Karlovsky describes Martins history of his neurogenic bladder dysfunction and

his prior management by intermittent self-catheterization to drain his blader. (Karlovsky Report at 3–5.) The doctor notes the resultant urinary tract infections and associated problems. (*Id.*) The doctor explains that individuals who are unable to empty their bladder will retain high volumes of urine, whereupon the bladder becomes distended and results in pain, nausea, vomiting and urinary tract infection. (*Id.* at 6.) The InterStim device facilitates urination. (*Id.* at 6–7.)

The doctor states that, "[i]t is not reasonable to expect a person with an InterStim device for urinary retention to live indefinitely or even periodically without access to the controller." (*Id.* at 7.) The doctor offers that the device looks like a cell phone but does not make or receive calls, send or receive text messages, or access the internet. (*Id.*) Yet, as discussed below, it has a camera function. Dr. Karlovsky also attests to the device's wireless communication capability (perhaps Bluetooth?), declares it App driven and that it has some communication value with a clinician programmer. (*Id.* at 7–10.) This later function is unexplained. How the App is updated is also unexplained.

In the end, Dr. Karlovsky's opinions are undermined by incomplete or inaccurate patient history, a misunderstanding of the full protocol for use offered at FCI Butner as discussed by Ms. Runyon in her supplemental declaration, and the records of Martins' use/lack of use of the device and the absence of complications. In the medical logs at FCI Butler (ECF No. 229), Martins shows a consistent pattern of "no shows" and refusal of care, which do not sustain a claim that he is in anyway not being provided adequate medical care.

Over the period from August 22 to October 8, 2025, the medical logs have 94 events recorded concerning Martins' access/use of the Interstim controller at the FCI Butner facility. (ECF No. 235.)  Of the 94 events, 71 are noted as "No Show," 3 "Refused," 4 "Unavailable," and 17 "Completed." (*Id.*) On August 25 at 8:50 a.m., the log notes a refusal and quotes Martins as saying, "I don't need it now." (*Id.* at 1851.) Later that day at 5:57 p.m., another refusal is noted, and the comment noted is "Stated only comes when he needs it." (*Id.*) An entry on September 4, 2025, at 2:22 p.m. reflects a failure to show for two

1  "callouts." (*Id.* at 1850.) Finally, a note on September 16, 2025, marked "Unavailable,"
2  adds "recall does not show on a regular basis." (*Id.* at 1849.)

3      This inconsistent use pattern has also been noted by the doctors at FCI Butner. On
4  September 18, 2025, it is noted that the potential to consider if Martins is not utilizing the
5  stimulator regularly (ECF No. 235 at Bates 001391.) In fact, the doctors note that, the "RNs
6  report not using bladder stimulator twice daily; pt reports only needs stimulator when
7  unable to urinate spontaneously. (*Id,* at Bates 001389). The doctor emphasized the
8  importance of not refusing urology consults and regular use of the bladder stimulator. (*Id.*)
9  On October 3, 2025, the doctor notes that, "pt has access twice daily and is not utilizing
10 stimulator twice daily." (*Id.* at Bates 001364.) Martins refused to attend a urology
11 appointment on September 5, 2025. (ECF No. 235 at 001521.)

12     Martins supplemented the record with "Call out" sheets for October 15, 17, 18, 20
13 showing that he was called out 3 times in those dates. (ECF No. 233.) No records for
14 October 16 or 19 were submitted.

15     These records show a poor history of compliance on Martins part and not any failure
16 on the part of Butner to provide care for his needs. Clearly, his needs for the device are
17 well met, and he is resorting to self-help or manipulation of the system by choice. Despite
18 scheduled access and the ability to access the controller at other times, the record of use is
19 abysmal by choice. Against this backdrop, the facts do not warrant relief.

20     The government also makes a legitimate argument regarding security. The device
21 controlling the InterStim is, essentially, an electronic device with a potential for misuse.
22 This was demonstrated by Martins himself when he managed to take 2 photos with the
23 device and added text to one of them. (ECF No. 219 at 3; *see also* ECF No. 219-2.) These
24 were in the "deleted file" of the device. (ECF No. 219 at 3.) The device clearly has storage
25 capability for data. Perhaps the camera could be disabled as Dr. Karlovsky suggests, but it
26 will remain an electronic device with Bluetooth capability and a playground for mischief
27 or misuse in the wrong hands. Bottom line, he has not made a case to possess it.

28     For the reasons set forth below, the Motion is **DENIED**.

## Discussion

Martins has the burden of proof that his unique medical situation presents "extraordinary and compelling reasons" for granting a motion for compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A)(i); *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green,* 764 F.3d 1352, 1356 (11th Cir. 2014).

On November 1, 2023, the United States Sentencing Commission issued new guidelines (the "Guidelines") that made substantial amendments to the policy statement for reductions of sentences under § 3582(c)(1)(A). It continues to provide that a court may reduce a sentence after considering the § 3553(a) factors if it finds that (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. The Guidelines provide the "extraordinary and compelling reasons" such as, *inter alia*, the "medical circumstances of the defendant," "age of the defendant," and "family circumstances of the defendant." *Id.* For purposes of our analysis, the "medical circumstances" most relevant to consider would be:

(B) The Defendant is –
  (i) suffering from a serious physical or medical condition,
  (ii) suffering from a serious functional or cognitive impairment, or
  (ii) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

Martins also avers that 18 U.S.C. § 3553(a) factors weigh in favor of his release. Before granting compassionate release, courts must "consider the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." See 18 U.S.C. § 3582(c)(1)(A). Ultimately, the section 3553(a) factors instruct courts to impose a sentence that is

"sufficient but not greater than necessary" to satisfy the purposes of punishment. *See* 18 U.S.C. § 3553(a).

## Conclusion

Martins fails to meet his burden of proof that his medical condition and medical care establish "extraordinary and compelling reasons" for granting a motion for compassionate release." *See* 18 U.S.C. § 3582(c)(1)(A)(i). Certainly, he suffers from a serious medical condition concerning his neurogenic bladder, which requires appropriate medical management. He has other well documented medical issues as well. This was true many years before he committed the crime in this case, and the medical situation (including a history of UTI's from self-catheterization) was carefully considered and the basis, among other things, for a substantial variance in Martins' sentence.

However, his situation appears substantially improved by the InterStim device. His complaint that it is not available enough is unsustainable.[2] Martins' complaints, and his statement of recent hospitalizations based on his testimony are belied by the evidence on file, including the Declarations filed by Ms. Runyon. (*See* Runyon Decl.; Suppl. Runyon Decl.) Martins does not have a condition that substantially diminishes the ability for him to provide self-care within the environment of a correctional facility. This was self-reported by Martins to a doctor at FCI Butner on September 8, 2025. (ECF No. 227 at 001410 ("States . . . can perform ADL's . . .") (i.e. activities of daily living).) His condition is serious but medically managed. While it clearly impacts his stay in custody, it does not substantially diminish his ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. The difficulty of being an inmate with his limitations, was already considered at sentencing, as previously

---

[2] His complaints of lack of access at FCI Terminal Island notwithstanding, his current custodial situation shows ready access to the device without the need for personal possession. The protocol at FCI Butner is very "user friendly" with freedom to access at any time. The records at FCI Butner do not show any complaints by Martins, no hospitalization (except upon transfer to Butner), nor increased medical needs at that facility, nor any change in his overall condition.

stated. Martins himself notes his activities in custody including the RDAP program and many other available programs. (ECF No. 199 at 14.) These daily activities and the ability to care for general personal needs demonstrate his abilities despite his disability.

The Court further finds that he is not being deprived of specialized medical care. The system for providing the stimulator as now provided at FCI Butner, perhaps while not perfect, meets a necessary balance of providing inmate care and institutional security. As demonstrated, Martins doesn't even use the device as scheduled on a regular basis, despite doctors' orders. In addition, Martins reported to his doctors an ability to urinate spontaneously as of September 18, 2025, yet he complains in this motion he requires 24/7 access.

The Court further finds no support for release under 3553(a). As well summarized by the Government:

> Martins distributed counterfeit pills containing fentanyl to a fellow veteran that was trying to rehabilitate himself. Martins knew N.A.R. was in a rehabilitation facility and enticed him with a photograph of pills and told him he would share them with N.A.R. Then, after Martins learned of N.A.R.'s death, he reached out to people he knew and attempted to point blame at the rehabilitation center that was treating N.A.R. by claiming they overprescribed Gabapentin—an extremely safe drug—to N.A.R.
>
> As a result of Martins' actions, N.A.R. is gone. N.A.R.'s family have spoken before this Court at sentencing about how much the loss has devastated them. Martins' actions sentenced them to a life without their loved one. The Government submitted at the June hearing the opposition of the family to the relief requested by Martins. This Court sentenced Martins to six years in custody for his role in N.A.R.'s death. To reduce his sentence from six years down to two years would not adequately reflect the seriousness of his offense nor would provide just punishment.

The Government adds, "Further, Martins in-custody violations should also weigh against his release. While Martins excuses his possession of unauthorized tools based on his interest in sculpting, Def. Mot. at 15:18–19, an equally plausible explanation is that he was keeping a makeshift weapon. *See* Exhibit 21 (describing the items as "hazardous tools"

and two screwdrivers.)"³ (*Id.*)

Martin's claims his refusals to work, and unauthorized possession of tools were due to personal safety concerns. (ECF No. 199 at 14–15.) He expresses a need to defend himself. (*Id.*) However, his misuse of the Stimulator control to take photos and his failure to follow the doctor's advice on the regular use of the stimulator seriously undermine his credibility. But, even if true, his personal safety allegations have not been asserted as grounds for relief, nor is there any corroborating evidence in that regard.

Upon full consideration of the facts, evidence and arguments, the Court does not find Martins has met his burden under § 3582(c)(1)(B) or (C), nor does a § 3553(a)-analysis support relief. At a minimum, the crime in this case was serious and resulted in the death of another individual. The need for punishment and deterrence, community safety, and the need to avoid disparity in sentencing far outweighed the mitigating factors at the time of sentencing and still do today. The Court finds the sentence imposed is sufficient but not greater than necessary under the statutory factors. Any reduction would be inappropriate and disparate.

The Motion is **DENIED.**

**IT IS SO ORDERED.**

Dated:  November 10, 2025

Hon. Anthony J. Battaglia
United States District Judge

---

³ The record includes disciplinary records of unauthorized possession of tools on June 13, 2024, and refusing to work in October and November 2024 (ECF No. 204, Exs. 21 and 22), as well as the already described misuse of the InterStim controls (ECF No. 219).